**JUDGE KOELTL**

**12 CIV 6774**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KOCH SUPPLY & TRADING, LP | Civil Action No. _____ |
| Plaintiff, | |
| -vs- | **COMPLAINT** |
| CALUMET SHREVEPORT FUELS, LLC, | **JURY TRIAL DEMANDED** |
| Defendant. | |

RECEIVED
SEP 7 2012
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff Koch Supply & Trading, LP ("KS&T" or "Plaintiff"), by its attorneys,

Seward & Kissel LLP, for its Complaint against Calumet Shreveport Fuels, LLC ("Calumet")

(together, the "Parties"), alleges as follows:

## NATURE OF ACTION

1.      On April 16, 2012, Calumet agreed to purchase 285,000 barrels of crude

oil from KS&T for delivery in May at May prices (the "May Contract").  KS&T was ready,

willing and able to deliver the barrels on time to the agreed upon destination in the May

Contract, a terminal in St. James, Louisiana.  But Calumet refused to assume ownership of the

barrels purportedly because it could not further transport the barrels on a specific pipeline to its

refineries near Shreveport, Louisiana.  Although not required by the May Contract, KS&T began

working diligently with Calumet to assist Calumet in securing alternative storage and transport

for the barrels – actions for which Calumet expressed appreciation to KS&T.

2.      Instead of following through with any of these commercially reasonable

alternatives, on May 31, 2012, Calumet sent KS&T a letter unilaterally alleging *force majeure*,

notwithstanding the fact that KS&T stood ready to fully perform under the contract and deliver

the barrels to the St. James Terminal as called for by the contract.  Calumet declared *force*

*majeure* on behalf of KS&T because *Calumet* allegedly could not transport the barrels via a specific pipeline from the delivery destination to its refineries. Calumet's *force majeure* declaration was on the last day, according to Calumet, for KS&T to perform under the May Contract. KS&T sought reasonable assurances from Calumet that it would still perform under the May Contract, but Calumet did not respond. KS&T ultimately declared default and terminated the May Contract.

3.      At or about the time Calumet was scheduled to receive the barrels, the market price for crude oil was rapidly falling. Faced with paying May prices for the barrels in a falling market, Calumet breached the May Contract and refused to accept the barrels. Calumet's actions were motivated by its own internal economics and its decision to no longer purchase barrels from KS&T, freeing Calumet to engage in commercially unreasonable behavior.

4.      Calumet's breach of the May Contract caused substantial harm to KS&T. KS&T was forced to re-sell the barrels at lower prices, and suffered a loss of over $4 million. KS&T brings this action against Calumet for breach of contract and declaratory judgment, and for full recovery of its losses caused by Calumet's refusal to perform under the May Contract.

## THE PARTIES

5.      Plaintiff KS&T is a limited partnership duly organized under the laws of the State of Delaware, with its principal place of business at 4111 E. 37th Street North, Wichita, Kansas, 67220. Plaintiff KS&T is a citizen of Kansas because it is directly or indirectly owned by Koch Industries, Inc., a privately held corporation organized under the laws of the State of Kansas with its principal place of business at 4111 E. 37th Street North, Wichita, Kansas, 67220.

6.      Upon information and belief, Defendant Calumet is a limited liability company organized under the laws of the State of Indiana, with its principal place of business at

2780 Waterfront Parkway East Drive, Suite 209, Indianapolis, Indiana, 46214. Calumet, upon information and belief, is not a citizen of Kansas.

## JURISDICTION AND VENUE

7.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     Venue is proper in this district under 28 U.S.C. § 1391(a) because KS&T and Calumet expressly agreed in the Dispute Resolution section of the May Contract to submit to the personal jurisdiction and venue of the United States District Court for the Southern District of New York. The May Contract states in part,

> either party may in its sole discretion submit a dispute or claim arising out of or in connection with [the May Contract] to the United States District Court for the Southern District of New York, USA, or if such court declines jurisdiction, any New York State Court in the Borough of Manhattan.

A copy of the May Contract is annexed hereto as Exhibit A.

## FACTS

**LOOP Segregation 17 Crude Oil**

9.     For nearly seven years, KS&T, a company that specializes, among other things, in trading and supplying crude oil, and Calumet, a refiner of petroleum products, entered into various agreements for the purchase and sale of Louisiana Offshore Oil Port ("LOOP") Segregation 17 Crude Oil ("Seg. 17" or "Seg. 17 Crude Oil").

10.     Seg. 17 Crude Oil is a blend of crude oil from the nations of Iraq, Kuwait, and Saudi Arabia shipped into and held at LOOP.  Specifically, Seg. 17 is stored in caverns at Clovelly, Louisiana.

11.     Under the various sales agreements between the Parties over the years, Seg. 17 Crude Oil was usually delivered by KS&T via the LOCAP pipeline from the holding caverns in Clovelly, Louisiana, to a terminal in St. James, Louisiana (the "St. James Terminal"). At the St. James Terminal, Seg. 17 Crude Oil can, among other storage/transport options, enter the ExxonMobil Northline pipeline (the "ExMo Pipeline") and proceed via that pipeline to Calumet's refineries near Shreveport, Louisiana.

12.     Crude oil is a marketable commodity.  There are several pipelines that service the St. James Terminal, allowing for delivery to many buyers.

**The May Contract**

13.     By way of the May Contract, KS&T agreed to sell 285,000 barrels of Seg. 17 Crude Oil to Calumet for delivery T-1 May 2012 to May 21, 2012.

14.     The price terms of the May Contract are, "US DOLLARS CLOSE OF WTI NYMEX 1ST NRBY PLUS USD 14.55 PER BARREL EFFECTIVE AVERAGE 1 MAY 2012 TO 31 MAY 2012.  IF THE PRICING DAY FALLS ON A SATURDAY, SUNDAY OR HOLIDAY, SKIP PRICING DAY.  FINAL PRICE CALCULATION SHALL BE ROUNDED TO 3 DECIMAL PLACES."

15.     The payment terms of the May Contract further provide that payment is "TO BE MADE IN US DOLLARS VIA ELECTRONIC FUNDS TRANSFER THROUGH EITHER SWIFT OR FEDWIRE FUNDS TRANSFER, AS APPLICABLE, ON OR BEFORE THE PREPAY NOT LATER THAN ONE BUSINESS DAYS [sic] PRIOR TO SHIP DATE."

16.     The May Contract designated delivery at the St. James Terminal: "**FIP ST JAMES LA** BY PIPELINE (EXXONMOBIL PIPELINE COMPANY) / SUB DURING T - 1 MAY 2012 TO 21 MAY 2012." (emphasis added.)

17.     The term "FIP" means Free In Pipeline and is a shipment term frequently used in crude oil sales contracts.  Under this term, KS&T delivers the Seg. 17 Crude Oil into the pipeline at St. James, where title passes to Calumet and KS&T's obligations under the May Contract are met.

18.     The May Contract does <u>not</u> require KS&T to deliver the Seg. 17 Crude Oil to Calumet's refinery in Shreveport.

**The April Contract**

19.     Before entering into the May Contract, Calumet entered into a virtually identical agreement with KS&T (the "April Contract") on March 12, 2012 for the purchase and sale of 225,000 barrels of Seg. 17 Crude Oil to be received "DURING T - 1 APRIL 2012 TO 30 APRIL 2012," the price being, "US DOLLARS CLOSE OF WTI NYMEX 1ST NRBY PLUS USD 14.90 PER BARREL EFFECTIVE AVERAGE 1 APRIL 2012 TO 30 APRIL 2012 INCLUSIVE. FINAL PRICE CALCULATION SHALL BE ROUNDED TO 3 DECIMAL PLACES. IF THE PRICING DAY FALLS ON A SATURDAY, SUNDAY OR HOLIDAY, SKIP PRICING DAY."  The April Contract also provides for delivery, "FIP ST JAMES LA BY PIPELINE (EXXONMOBIL PIPELINE COMPANY) / SUB DURING T - 1 APRIL 2012 TO 30 APRIL 2012."

20.     On April 30, 2012, the ExMo Pipeline shut down temporarily.  As of that date, Calumet had not yet submitted the necessary nominations for delivery of, nor had it submitted payment for, 80,000 barrels under the April Contract.  Subsequent to and despite the

closure of the ExMo Pipeline, KS&T ultimately arranged delivery of the April barrels to above-ground storage tanks in Clovelly, Louisiana, and Calumet paid KS&T for those barrels. Calumet never asserted *force majeure* for the April barrels, or otherwise disputed its obligations to receive and pay for the barrels notwithstanding any problems with the ExMo Pipeline.

**The Present Dispute**

21.     On Monday, April 23, 2012, Calumet sent to KS&T a schedule for May of Seg. 17 Crude Oil to Calumet.  The schedule was set forth as follows:

> 80K barrels on 5/3 due 5/1
>
> 75K barrels on 5/6 due 5/4
>
> 75K barrels on 5/11 due 5/9
>
> 75K barrels on 5/17 due 5/15
>
> 60K barrels on 5/24 due 5/22

The above schedule included both delivery of the April barrels (the 80,000 barrels referenced at the top), and all of the May barrels under the May Contract.

22.     KS&T transmitted the above schedule by email to the LOOP scheduler on April 25, 2012.

23.     On Monday morning, April 30, 2012, Calumet emailed KS&T, stating in part:

> The ExMo pipe had a 2000 barrel release north of Baton Rouge and is down for an indefinite period of time.  It will be a few days before we know any more and I'll keep you informed as we hear anything.

24.     Also on Monday morning, April 30, 2012, KS&T emailed Calumet an invoice for payment for both the April barrels and the first portion of Seg. 17 due under the May Contract, with the first delivery scheduled for May 3, 2012.  Calumet replied to KS&T, stating,

"[p]er our conversation in regards to the ExxonMobil pipeline problem, no payment due tomorrow. Do you agree?" KS&T replied, "[y]ep I agree."

25.     On May 3, 2012, Calumet emailed KS&T stating, "[n]ot looking good for the north line. What if they are down 4-6 weeks?" KS&T responded that it had arranged for low-cost storage at LOOP "until the barrels exit."

26.     Upon information and belief, on or about May 5 or May 6, 2012, portions of the ExMo Pipeline reopened, although apparently not all the way to Shreveport, Louisiana.

27.     KS&T then offered assistance to Calumet. On May 10, 2012, KS&T emailed Calumet stating in part,

> I was able to do Seg 17 time trade with Marathon on 160mb Seg 17 where they take 160mb May 13 and payback 160mb May 20(ish) which re-starts the storage clock on at least 160mb. These 160mb will have 30 days free storage commencing May 20(ish).

This "time trade" provided for free storage at LOOP from May 20th to June 20th, to which Calumet replied, "Thanks. No news yet on restart."

28.     Calumet responded to KS&T's email indicating that KS&T had negotiated deals to obtain free storage of "unmoved barrels committed to [Calumet]," with "[s]uper and thanks."

29.     During this period the price of crude oil was falling rapidly.

30.     During this time, KS&T and Calumet discussed alternative methods of delivery of the May barrels to Calumet, but Calumet did not avail itself of any of them.

31.     On May 31, 2012, Calumet sent a letter to KS&T purporting to terminate the May Contract based on *force majeure* (the "Calumet Termination Letter"). In its letter, despite the storage agreement having been reached and the terms of the May Contract thereby extended, Calumet suddenly changed its mind and asserted that "[n]o deliveries have been made

by [KS&T] under the [May Contract]," and that "Calumet has sustained substantial losses because it was not able to refine the crude oil at its Shreveport, Louisiana Refinery." In its letter, Calumet declared the May Contract terminated. Calumet claimed the shutdown of the ExMo Pipeline was a *force majeure* event, notwithstanding the fact that the May Contract called for delivery to the St. James Terminal and not the Shreveport Refinery.

32.     Also in its letter, Calumet admitted that it agreed to an extension of the delivery terms of the May Contract and further stated that it "was hopeful that deliveries of the barrels could occur in late May or early June."

33.     Calumet further agreed that it would "pay the storage fees actually incurred and not otherwise mitigated by time trades for the crude oil for the period May 1, 2012 through May 31, 2012."

34.     Upon information and belief, at this time, Calumet had also decided to terminate its physical crude oil business with KS&T, and, as such was no longer motivated to act reasonably to preserve the business relationship going forward.

35.     Later on May 31, 2012, KS&T sent a notice to Calumet (the "KS&T Demand") with respect to both the May Contract and the April Contract. In the KS&T Demand, KS&T rejected Calumet's request that it acknowledge that KS&T defaulted under the terms of the May Contract, denied that a *force majeure* event occurred, and denied that Calumet had effectively terminated the May Contract.

36.     In the KS&T Demand, KS&T noted that "delivery is to be taken by Calumet at a trade location (FIP ST JAMES LA BY PIPELINE (EXXONMOBIL PIPELINE COMPANY) / SUB . . . [and] KS&T has been willing and able to make delivery for some time

in accordance with this provision but has been working with [Calumet] to explore alternative delivery options for [Calumet's] benefit."

37.     In the KS&T Demand, KS&T also noted that the Calumet Termination Letter gave reasonable grounds for insecurity with respect to the May Contract and KS&T therefore demanded adequate assurances, to be provided within two working days of the KS&T Notice, of Calumet's due performance of the May Contract.

38.     Having received no timely response from Calumet to the KS&T Demand, late on Monday, June 4, 2012, KS&T sent another message to Calumet terminating the May Contract ("KS&T Termination Notice").  KS&T indicated that adequate assurances had been demanded in accordance with the terms of the May Contract and UCC 2-609, that failure to provide acceptable adequate assurances within two working days of a reasonable request by KS&T constituted an event of default, and that upon the occurrence of an event of default, KS&T could notify the defaulting party of an early termination date (which is to be no earlier than one working day after the date of such notice) on which the contract shall terminate.

39.     In the KS&T Termination Notice, KS&T notified Calumet that, in an effort to mitigate its damages under the May Contract, the May Contract would be effectively terminated as of one working day after the date of the KS&T Termination Notice.

40.     On June 8, 2012, in an effort to mitigate its damages under the May Contract, and after a bidding process, KS&T entered into an agreement to sell the 285,000 barrels of Seg. 17 Crude Oil to Marathon Petroleum Co. ("Marathon"), to be transferred by June 21, 2012 or before.

41.     Marathon purchased the 285,000 barrels of Seg. 17 Crude Oil at "NYMEX WTI pricing June 8th + 10.90."

42.     By virtue of its sale of 285,000 barrels of oil to Marathon at June prices rather than the May prices at which Calumet purchased the barrels, KS&T has suffered damages in an amount no less than $4,066,950.  The price terms in the May Contract provided for the purchase by Calumet of the May Barrels (285,000) at the rate of NYMEX WTI pricing May 1-31 + 14.55, for a total of $31,141,950 or $109.27 per barrel.  The terms of the cover deal with Marathon equal a sale price of $95.00 per barrel, for a total of $27,075,000.  Therefore, KS&T has suffered damages of no less than the difference between the original sale price and the cover price, $4,066,950, exclusive of interest, costs and attorneys' fees.

43.     KS&T has performed all of its obligations under the May Contract.

## FIRST CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

44.     Plaintiff realleges paragraphs 1 through 43 as if set forth fully herein.

45.     KS&T and Calumet agreed to and were bound by the terms of the May Contract for the purchase and sale of 285,000 barrels of Seg. 17.

46.     The May Contract indisputably created a valid and binding contract between the Parties, a fact which Calumet does not and cannot dispute.

47.     KS&T was at all material times, ready, willing, and able to perform its obligations under the express terms of the May Contract.

48.     Calumet failed and refused to perform its obligations under the terms of the May Contract as set forth above, and is in breach thereof.

49.     By reason of the foregoing, and as a direct and proximate result of Calumet's breach of the May Contract, KS&T has suffered damages in an amount to be determined at trial, but in no event less than $4,066,950, exclusive of interest, costs and attorneys' fees.

## SECOND CLAIM FOR RELIEF
## (DECLARATORY JUDGMENT)

50.     Plaintiff realleges paragraphs 1 through 43 as if set forth fully herein.

51.     The May Contract is a valid and enforceable contract between KS&T and Calumet for the purchase and sale of 285,000 barrels of Seg. 17 Crude Oil.

52.     As set forth above, Calumet has failed and refused to perform its obligations under the May Contract, claiming *force majeure*.

53.     A case of actual controversy exists as to whether a *force majeure* event occurred under the terms of the May Contract, within the meaning of 28 U.S.C. § 2201.

54.     By reason of the foregoing, KS&T is entitled to a declaration that a *force majeure* event has not occurred, that Calumet is in breach of the May Contract, and that KS&T is entitled to damages in an amount no less than $4,066,950 together with interest, costs and attorneys' fees.

WHEREFORE, Plaintiff respectfully requests this Court enter judgment as follows:

a)     awarding damages in an amount to be determined at trial, but not less than $4,066,950;

b)     declaring that a *force majeure* event has not occurred;

c)     awarding Plaintiff interest, attorneys' fees, costs and disbursements; and

d)     granting such other, further and different relief as is just.

New York, New York
September 7, 2012

SEWARD & KISSEL LLP

By: _____
    Bruce G. Paulsen
    Michael W. Broz

One Battery Park Plaza
New York, New York  10004

Tel.: (212) 574-1200
Fax:  (212) 480-8421

*Attorneys for Plaintiff*
*Koch Supply & Trading, LP.*

SK 27191 0002 1298692

Exhibit A

Mixed Sources

Product group from well-managed
forests, controlled sources and
recycled wood or fiber

Cert no. SW-COC-004131
www.fsc.org
© 1996 Forest Stewardship Council

*** ALL WRITTEN COMMUNICATIONS RELATED TO THIS TRANSACTION MUST BE SENT
PURSUANT TO THE NOTICE PROVISIONS OF THIS CONFIRMATION.   COMMUNICATIONS SENT
TO ANY OTHER ADDRESS OR NUMBER, OR TRANSMITTED BY ANY OTHER MEANS, ARE
WITHOUT LEGAL OR CONTRACTUAL FORCE OR EFFECT. ***

**DATE:**          16 APR 2012

**TO:**            CALUMET SHREVEPORT FUELS, LLC
**ATTN:**          CONTRACT ADMINISTRATION
**FAX**            1-318-632-4091

**CC:**


**RE:**            CONTRACT #3131230

KOCH SUPPLY & TRADING, LP IS PLEASED TO CONFIRM THE FOLLOWING TRANSACTION WAS
CONCLUDED ON 13 APRIL 2012 BETWEEN MARK KAMINSKI OF KOCH SUPPLY & TRADING, LP
AND ROB MILLS OF CALUMET SHREVEPORT FUELS, LLC.   THIS CONTRACT CANCELS AND
SUPERSEDES ANY BROKER CORRESPONDENCE IN RELATION TO THIS TRANSACTION WHICH,
IF ANY, SHALL BE FOR THE SOLE PURPOSE OF DOCUMENTING COMMISSION.


**SELLER**
KOCH SUPPLY & TRADING, LP
4111 E. 37TH   STREET N.
WICHITA, KS 67220
USA

**BUYER**
CALUMET SHREVEPORT FUELS, LLC
2780 WATERFRONT PKWY E DR SUITE 209
INDIANAPOLIS, IN 46214 UNITED STATES

**DESCRIPTION OF PRODUCT:**
LOOP SEGREGATION 17 CRUDE OIL

**QUANTITY:**
285,000 BARRELS PER ENTIRE CONTRACT

**PRICE:**
THE PRICE OF THE PRODUCT IS US DOLLARS CLOSE OF WTI NYMEX 1ST NRBY PLUS USD
14.55 PER BARREL EFFECTIVE AVERAGE 1 MAY 2012 TO 31 MAY 2012. IF THE PRICING
DAY FALLS ON A SATURDAY, SUNDAY OR HOLIDAY, SKIP PRICING DAY. FINAL PRICE
CALCULATION SHALL BE ROUNDED TO 3 DECIMAL PLACES.

**DELIVERY:**
FIP ST JAMES  LA BY PIPELINE (EXXONMOBIL PIPELINE COMPANY) / SUB DURING T - 1
MAY 2012 TO 21 MAY 2012.

**CREDIT TERMS:**
BUYER TO ESTABLISH AN IRREVOCABLE STANDBY LETTER OF CREDIT ISSUED BY A FIRST
CLASS INTERNATIONAL BANK, AND BE IN A FORMAT AND AMOUNT ACCEPTABLE TO SELLER.
WHERE PRODUCT MOVEMENT IS BY VESSEL, BUYER SHALL COMPLY BY EITHER POSTING AN
IRREVOCABLE BANK LETTER OF CREDIT FIVE (5) BANKING DAYS PRIOR TO THE EARLIER
OF THE FIRST DAY OF THE DELIVERY DATE RANGE OR, IN THE CASE OF CFR OR CIF
DELIVERY, THE FIRST DAY OF LOADING, OR PREPAYMENT BY FEDWIRE FUNDS TRANSFER
THREE (3) BANKING DAYS PRIOR TO THE EARLIER OF THE FIRST DAY OF THE DELIVERY
DATE RANGE OR, IN THE CASE OF CFR OR CIF DELIVERY, THE FIRST DAY OF LOADING.
WHERE PRODUCT MOVEMENT IS BY MEANS OTHER THAN VESSEL, BUYER SHALL COMPLY BY
EITHER POSTING AN IRREVOCABLE BANK LETTER OF CREDIT THREE (3) BANKING DAYS
PRIOR TO THE EARLIER OF THE FIRST DAY OF THE DELIVERY DATE RANGE OR, IN THE

1

CASE OF CFR OR CIF DELIVERY, THE FIRST DAY OF LOADING, OR PREPAYMENT BY FEDWIRE FUNDS TRANSFER TWO (2) BANKING DAYS PRIOR TO THE EARLIER OF THE FIRST DAY OF THE DELIVERY DATE RANGE OR, IN THE CASE OF CFR OR CIF DELIVERY, THE FIRST DAY OF LOADING. ALL BANKING CHARGES SHALL BE BORNE BY COUNTERPARTY. IF THE BUYER FAILS TO STRICTLY COMPLY WITH THE FOREGOING REQUIREMENTS, SELLER SHALL, IN ADDITION TO ANY OTHER AVAILABLE REMEDIES, HAVE THE OPTION OF CANCELING THE CONTRACT AND/OR PROCEEDING AGAINST BUYER FOR DAMAGES OCCASIONED BY BUYER'S FAILURE TO PERFORM.

**PAYMENT TERMS:**
TO BE MADE IN US DOLLARS VIA ELECTRONIC FUNDS TRANSFER THROUGH EITHER SWIFT OR FEDWIRE FUNDS TRANSFER, AS APPLICABLE, ON OR BEFORE THE PREPAY NOT LATER THAN ONE BUSINESS DAYS PRIOR TO SHIP DATE, WITHOUT OFFSET, DEDUCTION, OR COUNTER-CLAIM, EXCEPT AS OTHERWISE PROVIDED HEREIN OR BY SEPARATE WRITTEN AGREEMENT BETWEEN THE PARTIES.

IF A PAYMENT DATE FALLS ON A SATURDAY OR BANKING HOLIDAY OTHER THAN A MONDAY, PAYMENT WILL BE DUE ON THE PRECEDING BUSINESS DAY.  IF A PAYMENT DATE FALLS ON A SUNDAY OR MONDAY BANKING HOLIDAY, PAYMENT WILL BE DUE ON THE FOLLOWING BUSINESS DAY.

EACH PARTY WARRANTS AND REPRESENTS THAT ANY PAYMENT INSTRUCTIONS GIVEN AND ANY PAYMENTS MADE BY SUCH PARTY PURSUANT TO THIS AGREEMENT WILL BE DULY AUTHORIZED BY SUCH PARTY IN GOOD FAITH AND WITH THE INTENT TO COMPLY WITH ALL APPLICABLE ANTI-CORRUPTION AND ANTI-MONEY LAUNDERING LAWS, RULES AND REGULATIONS (INCLUDING WITHOUT LIMITATION ANY RELEVANT TAX AND CURRENCY REGULATIONS).  EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT IT HAS ALL NECESSARY AUTHORITIES, LICENSES AND APPROVALS TO MAKE SUCH PAYMENTS AND/OR GIVE SUCH PAYMENT INSTRUCTIONS. ANY PROVISIONS RELATING TO PAYMENT BY LETTER OF CREDIT ARE NOT INTENDED TO AND SHALL NOT BE CONSTRUED AS ALTERING, VARYING, OR QUALIFYING THE BUYER'S DUTY TO MAKE PAYMENT IN FULL BY THE PAYMENT DUE DATE, NOTWITHSTANDING THE FAILURE OF ANY BANK TO HONOR THE LETTER OF CREDIT DUE TO A LEGAL OR REGULATORY IMPEDIMENT, INCLUDING WITHOUT LIMITATION THE IMPOSITION OF TRADE SANCTIONS.

ANY INVOICES PAYABLE BY KOCH MUST BE PRESENTED IN WICHITA TO THE SETTLEMENT CONTACT INDICATED BELOW.  FOR THE PURPOSES OF THIS SECTION, A WORKING DAY MEANS A NORMAL WORKING DAY IN THE LOCATION OF THE SETTLEMENT CONTACT. WITHOUT PREJUDICE TO ANY OF THE SELLER'S RIGHTS, IF THE BUYER FAILS TO PAY IN FULL ANY SUMS ON THE DUE DATE, THE SELLER SHALL HAVE THE RIGHT TO CHARGE INTEREST ON A DAILY BASIS AT THE PRIME RATE AS LISTED IN THE WALL STREET JOURNAL, PLUS 2 PERCENTAGE POINTS ON ANY UNPAID AMOUNT FROM THE DUE DATE TO THE DATE ON WHICH THE SELLER RECEIVES FULL PAYMENT IN CLEARED FUNDS.

**TITLE AND RISK OF LOSS:**
SHALL PASS FROM SELLER TO BUYER AT THE COMPLETION OF THE TRANSFER.

**CONTACTS:**
OPERATIONAL (CARGOES):
KRISTI RUBLE            PHONE (713) 544-5114
DEREK GRAHAM           PHONE (713) 544-5315
                       FAX   (281) 582-3408
                       CRUDEOPS@KOCHIND.COM


OPERATIONAL (PIPELINE):
DEREK GRAHAM           PHONE (713) 544-5315

CONTRACTUAL (WATERBORNE):
BRETT REICHENBERGER    PHONE (316) 828-5895
BOB DICK               PHONE (316) 828-7615
CONTRACTUAL (PIPELINE):
KEVIN D. REGULAR       PHONE (316) 828-6870

08/30/12 4:25 PM

```
DANIELLE KING              PHONE (316) 828-8887
BOB DICK                   PHONE (316) 828-7615
                           FAX   (281) 582-2015
                           INTLCONT@KOCHIND.COM


CREDIT:
JEFF ORR                   PHONE (316) 828-5965
                           FAX   (281) 582-6194


INVOICES:
REBECCA KLAASSEN           PHONE (316) 828-5896
TRACY WINSOR               PHONE (316) 828-6994
                           FAX   (281) 582-7518
                           PRODUCTSETTLEMENT@KOCHIND.COM


DEMURRAGE:
BOB DOLECHEK               PHONE (316) 828-8446
DOMINIQUE PEARSON          PHONE (713) 544-4585
                           FAX   (281) 582-7617
                           KSTDEMURRAGE@KOCHIND.COM
```

**TAXES:**
THE SELLER SHALL BE RESPONSIBLE FOR AND SHALL INDEMNIFY THE BUYER IN RESPECT OF ANY EXISTING OR FUTURE DUTIES, TAXES, TARIFFS, FEES OR CHARGES WHATSOEVER (INCLUDING BUT NOT LIMITED TO ALL OF THE FOLLOWING TAXES OR CHARGES: PRODUCTION, SEVERANCE, FEDERAL SUPERFUND, OIL SPILL OR POLLUTION, AND THOSE IMPOSED BY A GOVERNMENT IN THE COUNTRY OF ORIGIN) ARISING PRIOR TO DELIVERY IN CONNECTION WITH THE PRODUCT OR ITS SALE, DELIVERY OR EXPORT.

THE BUYER SHALL BE RESPONSIBLE FOR AND SHALL INDEMNIFY THE SELLER, ITS SUPPLIER AND/OR THE OWNERS OF ANY BONDED PREMISES FROM WHICH THE PRODUCT IS DISPATCHED, IN RESPECT OF ANY EXISTING OR FUTURE DUTIES, TAXES, TARIFFS, FEES OR CHARGES WHATSOEVER (INCLUDING BUT NOT LIMITED TO ALL GOVERNMENTAL CHARGES IMPOSED IN THE COUNTRY OF ORIGIN AND SUCH TAXES, DUTIES, IMPOSTS, FEES AND CHARGES IMPOSED OR LEVIED BY ANY GOVERNMENTAL, LOCAL OR PORT AUTHORITY SUCH AS EXCISE DUTY, MINERAL OIL TAX, OR VAT) ARISING AT OR AFTER DELIVERY IN CONNECTION WITH THE PRODUCT, ITS SALE, DELIVERY, IMPORT, EXPORT OR USE.

**ASSIGNMENT:**
NEITHER SELLER NOR BUYER SHALL ASSIGN THE WHOLE OR ANY PART OF ITS RIGHTS AND OBLIGATIONS HEREUNDER DIRECTLY OR INDIRECTLY WITHOUT THE PRIOR WRITTEN CONSENT OF THE OTHER PARTY, SUCH CONSENT NOT TO BE UNREASONABLY WITHHELD. UNLESS OTHERWISE AGREED IN WRITING, THE ASSIGNING PARTY SHALL NOT BE RELEASED FROM ITS OBLIGATIONS HEREUNDER FOLLOWING SUCH ASSIGNMENT.

**SPECIAL PROVISIONS:**
IN ALL EVENTS, AND NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, UPON EXPIRATION OF THIS AGREEMENT AND AFTER ALL MONETARY OBLIGATIONS UNDER THIS AGREEMENT HAVE BEEN SATISFIED, IF AN IMBALANCE VOLUME OF 1,000 NET BARRELS OR MORE EXISTS, EITHER PARTY MAY NOTIFY THE OTHER PARTY OF SAME, SUCH NOTIFICATION TO BE IN WRITING AND MADE WITHIN SIXTY (60) DAYS AFTER EXPIRATION OF THIS AGREEMENT.  SAID IMBALANCE SHALL BE SETTLED BY THE UNDER-DELIVERING PARTY MAKING DELIVERY OF THE TOTAL IMBALANCE VOLUME IN ACCORDANCE WITH THE DELIVERY PROVISIONS OF THIS AGREEMENT APPLICABLE TO THE UNDER-DELIVERING PARTY, UNLESS MUTUALLY AGREED TO THE CONTRARY.  IF NEITHER PARTY NOTIFIES THE OTHER PARTY AS TO THE EXISTENCE OF AN IMBALANCE WITHIN SIXTY (60) DAYS AFTER EXPIRATION OF THIS AGREEMENT, OR IF THE IMBALANCE VOLUME IS 1,000 NET BARRELS OR LESS, THEN BOTH PARTIES WAIVE THE RIGHT TO ANY SETTLEMENT OF THE IMBALANCE UNDER THIS AGREEMENT.

SETTLEMENT PRICING RELATED TO EXCHANGE IMBALANCES TRANSACTED ON A POSTING PLUS BASIS WILL BE BASED ON THE ACTUAL EDQ POSTING PRICE PLUS THE GATHERING

3

AND HANDLING ESTABLISHED AND AGREED UPON FOR THE ACTUAL BUSINESS MONTH(S) DURING WHICH TIME THE EXCHANGE IMBALANCE(S) OCCURRED CONSISTENT WITH AN ALTERNATIVE FLAT PRICE SETTLEMENT PROCEDURE.

**LIMITATION OF LIABILITY:**
NOTWITHSTANDING ANY OTHER PROVISION IN THIS CONTRACT, NEITHER PARTY SHALL BE LIABLE IN CONTRACT OR IN TORT OR OTHERWISE FOR ANY CONSEQUENTIAL OR INDIRECT DAMAGE OR LOSS OR LOSS OF PROFIT ARISING OUT OF THE PERFORMANCE OR NON-PERFORMANCE OF ANY TERM OF THIS CONTRACT, WHETHER OR NOT SUCH LOSS OR DAMAGE IS FORESEEABLE.

**DEFAULT:**
AN EVENT OF DEFAULT ('EVENT OF DEFAULT') WITH RESPECT TO A PARTY OR, IF THE OBLIGATIONS OF A PARTY ARE GUARANTEED BY ANOTHER PARTY WHETHER UNDER THIS CONTRACT OR OTHERWISE, THE GUARANTOR OF SUCH PARTY (EACH OR EITHER A 'DEFAULTING PARTY') SHALL MEAN ANY OF THE FOLLOWING -

(A) THE FAILURE OF THE DEFAULTING PARTY TO PAY WHEN DUE ANY REQUIRED PAYMENT UNDER THIS CONTRACT WITHIN 2 WORKING DAYS AFTER WRITTEN NOTICE THEREOF;

(B) THE FAILURE OF THE DEFAULTING PARTY TO COMPLY WITH ITS OTHER OBLIGATIONS UNDER THIS CONTRACT AND SUCH FAILURE REMAINS UNCURED FOR 5 WORKING DAYS AFTER WRITTEN NOTICE THEREOF;

(C) ANY REPRESENTATION OR WARRANTY MADE BY THE DEFAULTING PARTY UNDER THIS CONTRACT SHALL PROVE TO BE UNTRUE WHEN MADE IN ANY MATERIAL RESPECT;

(D) THE DEFAULTING PARTY FILES A PETITION OR OTHERWISE COMMENCES OR AUTHORISES THE COMMENCEMENT OF A PROCEEDING OR CASE UNDER ANY BANKRUPTCY, REORGANIZATION, OR SIMILAR LAW FOR THE PROTECTION OF CREDITORS OR HAS ANY SUCH PETITION FILED OR PROCEEDING COMMENCED AGAINST IT;

(E) THE DEFAULTING PARTY OTHERWISE BECOMES BANKRUPT OR INSOLVENT (HOWEVER EVIDENCED) OR IS UNABLE TO PAY ITS DEBTS AS THEY FALL DUE BY ACCELERATION OR OTHERWISE;

(F) THE DEFAULTING PARTY MERGES OR BECOMES CONSOLIDATED WITH ANY OTHER ENTITY OR TRANSFERS, BY ANY MEANS, ALL OR SUBSTANTIALLY ALL OF ITS ASSETS TO ANOTHER ENTITY AND THE CREDITWORTHINESS OF THE RESULTING, SURVIVING OR TRANSFEREE ENTITY IS MATERIALLY WEAKER THAN THAT OF THE DEFAULTING PARTY IMMEDIATELY PRIOR TO SUCH ACTION AS REASONABLY DETERMINED BY THE PARTY NOT IN DEFAULT (THE 'NON-DEFAULTING PARTY');

(G) THE DEFAULTING PARTY FAILS TO COMPLY WITH A REQUEST FROM KOCH PURSUANT TO THIS CONTRACT FOR ADEQUATE ASSURANCE ACCEPTABLE TO KOCH WITHIN 2 WORKING DAYS OF A REASONABLE REQUEST; OR

(H) THE DEFAULTING PARTY DISAFFIRMS, DISCLAIMS, REPUDIATES OR REJECTS, IN WHOLE OR IN PART, OR CHALLENGES THE VALIDITY OF THE GUARANTEE ISSUED BY THE GUARANTOR.

UPON THE OCCURRENCE OF AN EVENT OF DEFAULT THE NON-DEFAULTING PARTY MAY IN ITS SOLE DISCRETION: (1) NOTIFY THE DEFAULTING PARTY OF AN EARLY TERMINATION DATE (WHICH SHALL BE NO EARLIER THAN 1 WORKING DAY AFTER THE DATE OF SUCH NOTICE) ON WHICH THIS CONTRACT SHALL TERMINATE (THE "EARLY TERMINATION DATE"); (2) WITHHOLD ANY PAYMENTS DUE TO THE DEFAULTING PARTY UNTIL SUCH EVENT OF DEFAULT IS CURED; AND/OR (3) SUSPEND OR POSTPONE PERFORMANCE OF ITS OBLIGATIONS UNDER THIS CONTRACT UNTIL SUCH EVENT OF DEFAULT IS CURED.

IF A NOTICE OF AN EARLY TERMINATION DATE IS GIVEN UNDER THIS CLAUSE, THE EARLY TERMINATION DATE WILL OCCUR ON THE DESIGNATED DATE WHETHER OR NOT THE RELEVANT EVENT OF DEFAULT IS THEN CONTINUING. WHERE THE EVENT OF DEFAULT IS

ONE OR MORE OF THE EVENTS DESCRIBED AT (D) TO (H) ABOVE, THE NON-DEFAULTING PARTY AND ITS AFFILIATES MAY, IN ADDITION TO ITS RIGHTS TO TERMINATE THIS CONTRACT, TERMINATE ANY OTHER TRANSACTION, CONTRACT OR OBLIGATION BETWEEN THE NON-DEFAULTING PARTY OR ITS AFFILIATES AND THE DEFAULTING PARTY, BY INCLUDING DETAILS OF SUCH TRANSACTIONS, CONTRACTS OR OBLIGATIONS WITHIN THE NOTICE OF AN EARLY TERMINATION DATE.

IF AN EVENT OF DEFAULT OCCURS AND AN EARLY TERMINATION DATE IS ESTABLISHED, THE NON-DEFAULTING PARTY MAY (IN ITS ABSOLUTE DISCRETION) NET AND SETOFF ANY AND/OR ALL AMOUNTS WHICH THE DEFAULTING PARTY OWES TO THE NON-DEFAULTING PARTY OR ITS AFFILIATES (UNDER THIS CONTRACT OR OTHERWISE) AGAINST ANY AND/OR ALL AMOUNTS WHICH THE NON-DEFAULTING PARTY OR ITS AFFILIATES OWES TO THE DEFAULTING PARTY (UNDER THIS CONTRACT OR OTHERWISE). THE NON-DEFAULTING PARTY SHALL NOTIFY THE DEFAULTING PARTY OF THE NET AMOUNT OWED TO THE NON-DEFAULTING PARTY AND ITS AFFILIATES, AND THE DEFAULTING PARTY SHALL PAY SUCH AMOUNT TO THE NON-DEFAULTING PARTY IN FULL FORTHWITH, WHICH AMOUNT SHALL BEAR INTEREST AT THE PRIME RATE AS LISTED IN THE WALL STREET JOURNAL, PLUS 2 PERCENTAGE POINTS FROM THE DATE OF TERMINATION.

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS CONTRACT OR IN LAW, THE NON-DEFAULTING PARTY SHALL NOT BE REQUIRED TO PAY TO THE DEFAULTING PARTY ANY NET AMOUNT DUE TO AN EARLY TERMINATION UNTIL THE NON-DEFAULTING PARTY RECEIVES CONFIRMATION SATISFACTORY TO IT IN ITS REASONABLE DISCRETION THAT ALL OBLIGATIONS OF ANY KIND WHATSOEVER OF THE DEFAULTING PARTY TO MAKE ANY PAYMENTS TO THE NON-DEFAULTING PARTY OR ANY OF ITS AFFILIATES UNDER THIS CONTRACT AND/OR ON ANY ACCOUNT WHATSOEVER WHICH ARE DUE AND PAYABLE AS OF THE EARLY TERMINATION  DATE HAVE BEEN FULLY AND FINALLY PERFORMED.

THE DEFAULTING PARTY SHALL INDEMNIFY AND HOLD THE NON-DEFAULTING PARTY HARMLESS FROM ALL LOSSES, DAMAGES, COSTS AND EXPENSES INCLUDING REASONABLE ATTORNEYS FEES (COLLECTIVELY THE 'LOSSES'), INCURRED IN CONNECTION WITH AN EVENT OF DEFAULT, TERMINATION, OR EXERCISE OF ANY REMEDIES HEREUNDER.  THE NON-DEFAULTING PARTY SHALL IN A COMMERCIALLY REASONABLE MANNER CALCULATE ITS LOSSES, IF ANY, RESULTING FROM SUCH DEFAULT, TERMINATION OR EXERCISE OF REMEDIES.

THE PROVISIONS OF THIS DEFAULT CLAUSE SHALL BE WITHOUT PREJUDICE AND IN ADDITION TO ANY RIGHT OF TERMINATION, SETOFF, COMBINATION OF ACCOUNTS, LIEN, OR OTHER RIGHT TO WHICH THE NON-DEFAULTING PARTY IS AT ANY TIME OTHERWISE ENTITLED (WHETHER BY OPERATION OF LAW, CONTRACT, OR OTHERWISE).  THE PARTIES AGREE THAT THIS CONTRACT CONSTITUTES A 'FORWARD CONTRACT' AND THAT EACH PARTY IS A 'FORWARD CONTRACT MERCHANT' FOR THE PURPOSES OF SECTION 556 OF THE U.S. BANKRUPTCY CODE.

**COMPLIANCE:**
EACH PARTY TO THIS CONTRACT SHALL COMPLY WITH AND ABIDE BY ALL APPLICABLE STATUTES, RULES, REGULATIONS, ORDERS AND DIRECTIVES OF ANY RELEVANT GOVERNMENTAL AUTHORITY IN THE PERFORMANCE OF THIS CONTRACT. WITHOUT LIMITATION, EACH PARTY AGREES TO COMPLY WITH AND ASSIST THE OTHER PARTY IN COMPLYING WITH ALL APPLICABLE U.S. OR OTHER ECONOMIC SANCTIONS AND EXPORT CONTROL LAWS AND REGULATIONS.  SELLER REPRESENTS AND WARRANTS THAT IT HAS NO KNOWLEDGE OR REASON TO BELIEVE THAT THE PRODUCT RECEIVED IN CONNECTION WITH THIS CONTRACT ORIGINATED IN OR WAS PROCURED FROM OR VIA A COUNTRY, ENTITY, OR PERSON, INCLUDING ANY AGENT OR AFFILIATE THEREOF, THAT IS PROHIBITED UNDER APPLICABLE ECONOMIC SANCTIONS LAWS, OR THAT ANY SUCH COUNTRY, ENTITY, OR PERSON HAS ANY PROPERTY INTEREST IN THE PRODUCT, EITHER PRESENT, FUTURE, CONTINGENT, DIRECT OR INDIRECT, THAT WOULD SUBJECT THE PRODUCT OR THIS CONTRACT TO BLOCKING OR OTHER GOVERNMENTAL SANCTION OR TRADE RESTRICTION. BUYER SHALL NOT, DIRECTLY OR INDIRECTLY, EXPORT, REEXPORT, OR OTHERWISE DISPOSE OF ANY OF THE PRODUCT RECEIVED IN CONNECTION WITH THIS CONTRACT TO OR VIA ANY PERSON, ENTITY, OR DESTINATION, OR FOR ANY USE PROHIBITED UNDER

5

APPLICABLE LAW WITHOUT OBTAINING PRIOR AUTHORISATION FROM THE COMPETENT
GOVERNMENT AUTHORITIES.

BREACH OF THE FOREGOING EXPORT CONTROL AND TRADE SANCTIONS OBLIGATIONS SHALL
CONSTITUTE CAUSE FOR IMMEDIATE TERMINATION OF THIS CONTRACT AND THE BREACHING
PARTY SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS THE OTHER PARTY FOR AND
AGAINST ANY RESULTING LOSSES, DAMAGES, PENALTIES, LIABILITIES, COSTS AND
EXPENSES. THIS PROVISION SHALL SURVIVE TERMINATION OF THIS CONTRACT.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN OR RELATED HERETO, NOTHING IN
THIS CONTRACT SHALL, OR SHALL BE INTERPRETED OR CONSTRUED TO, INDUCE OR
REQUIRE EITHER PARTY HERETO TO ACT IN ANY MANNER (INCLUDING TAKING OR FAILING
TO TAKE ANY ACTIONS IN CONNECTION WITH A TRANSACTION) WHICH IS INCONSISTENT
WITH, PENALISED OR PROHIBITED UNDER ANY APPLICABLE U.S. OR OTHER LAWS,
REGULATIONS OR OTHER OFFICIAL GOVERNMENT RULES OR REQUIREMENTS.

**GOVERNING LAW**
THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND
PERFORMANCE OF THIS CONTRACT TO THE EXCLUSION OF ANY OTHER LAW WHICH MAY BE
IMPUTED IN ACCORDANCE WITH CHOICE OF LAW RULES APPLICABLE IN ANY
JURISDICTION. THE UNITED NATIONS CONVENTION ON CONTRACTS FOR THE
INTERNATIONAL SALE OF GOODS OF VIENNA DATED 11TH OF APRIL 1980 SHALL NOT
APPLY TO THIS CONTRACT.

**DISPUTE RESOLUTION**
ANY DISPUTE OR CLAIM ARISING OUT OF OR IN CONNECTION WITH THIS CONTRACT THAT
IS NOT RESOLVED AMICABLY BY OR AMONG THE PARTIES SHALL BE SUBMITTED TO
BINDING ARBITRATION IN NEW YORK IN ACCORDANCE WITH THE SOCIETY OF MARITIME
ARBITRATORS, INC. RULES, REVISED SEPTEMBER 15, 2003. THE ARBITRATION TRIBUNAL
SHALL CONSIST OF A SINGLE IMPARTIAL ARBITRATOR WHO SHALL BE AN ATTORNEY
PRACTICING IN NEW YORK AND WHO SHALL HAVE AT LEAST 10 YEARS EXPERIENCE OF
SHIPPING AND TRADING MATTERS. IN THE EVENT THAT THE PARTIES FAIL TO AGREE
UPON THE SOLE ARBITRATOR WITHIN FOURTEEN (14) DAYS OF THE DATE OF THE
COMMENCEMENT OF THE ARBITRATION, THE AMERICAN ARBITRATION ASSOCIATION SHALL
ACT AS THE APPOINTING AUTHORITY TO PROMPTLY FACILITATE APPOINTMENT OF THE
ARBITRATOR AND ANY ATTENDANCE DISCLOSURES AND CHALLENGE OBLIGATIONS AND
PROCEDURES.

EITHER PARTY MAY IN ITS SOLE DISCRETION SUBMIT A DISPUTE OR CLAIM ARISING OUT
OF OR IN CONNECTION WITH THIS CONTRACT TO THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK, USA, OR IF SUCH COURT DECLINES TO
EXERCISE JURISDICTION OR DOES NOT HAVE SUBJECT MATTER JURISDICTION, ANY NEW
YORK STATE COURT IN THE BOROUGH OF MANHATTAN PROVIDED THAT AN ARBITRATION HAS
NOT BEEN COMMENCED UNDER THIS CONTRACT.

BUYER AND SELLER UNCONDITIONALLY CONSENT AND SUBMIT TO THE JURISDICTION OF
THE ABOVE ARBITRATION TRIBUNAL AND THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK, USA, OR ANY NEW YORK STATE COURT IN THE
BOROUGH OF MANHATTAN FOR THE RESOLUTION OF ALL DISPUTES AND CLAIMS ARISING
OUT OF OR IN CONNECTION WITH THIS CONTRACT.

**OTHER TERMS AND CONDITIONS:**
ALL CRUDE OIL SOLD/DELIVERED/TRANSACTED UNDER THIS AGREEMENT SHALL MEET
RELEVANT PIPELINE OR TERMINAL SPECIFICATIONS FOR THE APPROPRIATE GRADE OF
CRUDE OIL.

ALL OTHER TERMS AND CONDITIONS NOT IN CONFLICT WITH THE FOREGOING SHALL BE IN
ACCORDANCE WITH CONOCO GENERAL PROVISIONS FOR DOMESTIC CRUDE OIL AGREEMENTS
1-1-1993 INCLUDING THE FOLLOWING AMENDMENTS AND ARE HEREBY INCORPORATED BY

6

REFERENCE AS IF SET OUT IN FULL.  IN THE EVENT OF CONFLICT, THE SPECIFIC TERMS AS SET FORTH ABOVE SHALL PREVAIL.

**AMENDMENTS TO CONOCOPHILLIPS 1993 GENERAL PROVISIONS FOR DOMESTIC CRUDE OIL AGREEMENTS**

**E. FORCE MAJEURE:** EXCEPT FOR PAYMENT DUE HEREUNDER, EITHER PARTY HERETO SHALL BE RELIEVED FROM LIABILITY FOR FAILURE TO PERFORM HEREUNDER FOR THE DURATION AND TO THE EXTENT SUCH FAILURE IS OCCASIONED BY WAR, RIOTS, INSURRECTIONS, FIRE, EXPLOSIONS, SABOTAGE, STRIKES, AND OTHER LABOR OR INDUSTRIAL DISTURBANCES, ACTS OF GOD OR THE ELEMENTS, GOVERNMENTAL LAWS, REGULATIONS, OR REQUESTS, ACTS IN FURTHERANCE OF THE INTERNATIONAL ENERGY PROGRAM, DISRUPTION OR BREAKDOWN OF PRODUCTION OR
TRANSPORTATION FACILITIES, DELAYS OF PIPELINE CARRIER IN RECEIVING AND DELIVERING CRUDE OIL TENDERED, OR BY ANY OTHER CAUSE, WHETHER SIMILAR OR NOT, REASONABLY BEYOND THE CONTROL OF SUCH PARTY. ANY SUCH FAILURES TO PERFORM SHALL BE REMEDIED WITH ALL REASONABLE DISPATCH, BUT NEITHER PARTY SHALL BE REQUIRED TO SUPPLY SUBSTITUTE QUANTITIES FROM OTHER SOURCES OF SUPPLY. FAILURE TO PERFORM DUE TO EVENTS OF FORCE MAJEURE SHALL NOT EXTEND THE TERMS OF THIS AGREEMENT; PROVIDED, HOWEVER, THE
TERM OF THE AGREEMENT SHALL BE EXTENDED TO THE EXTENT NECESSARY TO COMPLY WITH THE PROVISIONS OF SECTION J. BUY/SELL AND EXCHANGE BALANCING.

IN ADDITION TO THE ABOVE, AND IN THE EVENT SUBSTANTIALLY SIMILAR VOLUMES ARE INTENDED TO BE BOUGHT AND SOLD OR EXCHANGED UNDER THIS AGREEMENT, THE PARTIES SHALL HAVE THE RIGHTS AND OBLIGATIONS SET
FORTH IN THE CIRCUMSTANCES DESCRIBED BELOW:

(1) IF, BECAUSE OF FORCE MAJEURE, A PARTY (THE "DELIVERING PARTY") IS UNABLE TO DELIVER PART OR ALL OF THE QUANTITY OF CRUDE OIL WHICH IT IS OBLIGATED TO DELIVER UNDER THIS AGREEMENT, THE OTHER PARTY (THE "RECEIVING PARTY") SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, TO REDUCE ITS DELIVERIES OF CRUDE OIL UNDER THIS AGREEMENT BY AN AMOUNT NOT TO EXCEED THE NUMBER OF BARRELS OF CRUDE OIL THAT THE DELIVERING PARTY FAILS TO DELIVER.

(2) IF, BECAUSE OF FORCE MAJEURE, THE RECEIVING PARTY IS UNABLE TO TAKE DELIVERY OF PART OR ALL OF THE QUANTITY OF CRUDE OIL TO BE DELIVERED BY THE DELIVERING PARTY UNDER THIS AGREEMENT, THE DELIVERING PARTY SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, TO REDUCE ITS RECEIPTS OF CRUDE OIL UNDER THIS AGREEMENT BY AN AMOUNT NOT TO EXCEED THE NUMBER OF BARRELS OF CRUDE OIL THAT THE RECEIVING PARTY FAILS TO TAKE DELIVERY OF.

**J. BUY/SELL AND EXCHANGE BALANCING:** THE TERMS OF THIS SECTION J SHALL ONLY APPLY TO THIS AGREEMENT IF SUBSTANTIALLY SIMILAR VOLUMES ARE INTENDED TO BE BOUGHT AND SOLD OR EXCHANGED UNDER THIS AGREEMENT:

EACH PARTY SHALL BE RESPONSIBLE FOR MAINTAINING THE VOLUMES BOUGHT AND SOLD OR EXCHANGED IN BALANCE ON A MONTH-TO-MONTH BASIS, AS NEAR AS REASONABLY POSSIBLE. IF A PARTY FAILS TO DELIVER OR TAKE ITS REQUIRED VOLUME DURING ANY MONTH ("SHORTFALL MONTH"), INCLUDING A FAILURE TO DELIVER OR TAKE DUE TO AN EVENT OF FORCE MAJEURE, DESPITE REASONABLE EFFORTS TO REMAIN IN BALANCE, SUCH VOLUMES ("IMBALANCE VOLUMES") SHALL BE DELIVERED AND TAKEN AS SOON THEREAFTER AS IS REASONABLY PRACTICABLE, AND THE TERM OF THIS AGREEMENT SHALL BE EXTENDED FOR THE SOLE PURPOSE OF BALANCING DELIVERIES. THE PARTIES SHALL ENDEAVOR TO CAUSE THE IMBALANCE VOLUMES CONFIRMED BY THE 20TH OF THE MONTH TO BE DELIVERED DURING THE FOLLOWING CALENDAR MONTH, AND THE IMBALANCE VOLUMES CONFIRMED AFTER THE 20TH OF THE MONTH TO BE DELIVERED DURING THE SECOND FOLLOWING CALENDAR MONTH, EXCEPT TO THE EXTENT PREVENTED BY THE CONTINUATION OF THE EVENT OF FORCE MAJEURE.

AN EVENT OF FORCE MAJEURE SHALL NOT RELIEVE EITHER PARTY FROM ITS OBLIGATIONS UNDER THIS SECTION J. TO BALANCE DELIVERIES ONCE THE EVENT OF FORCE MAJEURE

08/30/12 4:25 PM

HAS PASSED AND THE IMBALANCE CREATED DURING SAID PERIOD IS KNOWN. **FOR AVOIDANCE OF DOUBT, A DECLARATION OF FORCE MAJEURE IS NOT REQUIRED FOR THE TERMS OF THIS PROVISION TO APPLY.** IF IMBALANCE VOLUMES CREATED AS A RESULT OF AN EVENT OF FORCE MAJEURE HAVE NOT BEEN DELIVERED WITHIN THREE MONTHS AFTER THE SHORTFALL MONTH, AND NO OTHER RESOLUTION OF THE IMBALANCE VOLUMES HAS BEEN AGREED BETWEEN THE PARTIES, DURING THE FOURTH MONTH FOLLOWING THE SHORTFALL MONTH, THE DELIVERING PARTY SHALL DELIVER, AND THE RECEIVING PARTY SHALL TAKE, AN AMOUNT OF CRUDE OIL EQUAL TO THE IMBALANCE VOLUMES OF THE SAME TYPE, AT THE SAME LOCATION AND AT THE SAME PRICE AS WAS RECEIVED BY THE DELIVERING PARTY DURING THE SHORTFALL MONTH.

FOR ALL IMBALANCES, IF THE PRICE SPECIFIED IN THIS AGREEMENT IS A FIXED PRICE, OR A FORMULA PRICE WHICH IS BASED ON FIXED CALENDAR DATES (EG. APRIL 12, 2009 OR APRIL 12-19, 2009), THE PRICE OF THE IMBALANCE VOLUMES SHALL BE EQUAL TO SUCH PRICE WITHOUT REGARD TO THE MONTH OF ACTUAL DELIVERY. HOWEVER, IF THE PRICE SPECIFIED IN THE AGREEMENT IS A FORMULA PRICE NOT BASED ON FIXED CALENDAR DATES, THAT FORMULA, BASED ON PRICES FOR THE MONTH OF ACTUAL DELIVERY, WILL BE USED TO CALCULATE THE
PRICE FOR THE IMBALANCE VOLUMES, UNLESS SPECIFIED OTHERWISE IN THE SPECIAL PROVISIONS OF THIS AGREEMENT.

THE FOREGOING NOTWITHSTANDING, FOR ANY IMBALANCE VOLUMES EXISTING AT THE END OF THIS AGREEMENT LESS THAN 1000 BARRELS, THE OBLIGATION OF EITHER PARTY TO DELIVER OR TAKE SUCH IMBALANCE VOLUMES SHALL BE EXCUSED.

THE PARTIES ACKNOWLEDGE THAT THE TERMS AND CONDITIONS CONTAINED AND REFERENCED HEREIN CONFIRM THE AGREEMENT BETWEEN THE PARTIES AND DO NOT MATERIALLY ALTER SUCH AGREEMENT.  THIS CONFIRMATION WILL BE DEEMED ACCEPTED UNLESS CALUMET SHREVEPORT FUELS, LLC PROVIDES KOCH SUPPLY & TRADING, LP WITH NOTICE, BY TELEX OR FAX, OF ITS OBJECTION TO THIS CONFIRMATION WITHIN 5 DAYS OF RECEIPT.  KINDLY REFERENCE KOCH'S CONTRACT NUMBER AS STATED ABOVE ON ANY FUTURE CORRESPONDENCE RELATIVE TO THIS TRANSACTION.

WE ARE PLEASED TO HAVE CONCLUDED THIS BUSINESS WITH YOU AND WE LOOK FORWARD TO MORE BUSINESS WITH YOU IN THE FUTURE.

BEST REGARDS,

**BRETT** REICHENBERGER
KOCH SUPPLY & TRADING, LP

08/30/12 4:25 PM